JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | No. CV 08–1362 (PA) |
| | No. CV 08–1364 (PA) |
| BRANFORD PARTNERS, LLC, | |
| Debtor. | Bankruptcy Court Case No. |
| | SV06–12551 KT |
| _____ | |
| ALL-TEX, INC., | Adversary Case No. |
| Appellant, | 07–1117 KT |
| v. | |
| | OPINION AFFIRMING BANKRUPTCY |
| BERT FORNACIARI & LINDA | COURT ORDERS |
| FORNACIARI, individually and as co- | |
| trustees of the FORNACIARI FAMILY | |
| REVOCABLE TRUST DATED | |
| JANUARY 15, 2002, | |
| Appellees. | |
| _____ | |
| ALL-TEX, INC. | |
| Appellant, | |
| v. | |
| BRANFORD PARTNERS, LLC, | |
| Appellee. | |

Before the Court is appellant All-Tex, Inc.'s ("All-Tex") appeal of the United States Bankruptcy Court for the Central District of California's ("bankruptcy court") January 18, 2008 order granting summary judgment in favor of appellees Bert and Linda Fornaciari, both individually and as co-trustees of the Fornaciari Family Revocable Trust Dated January 15, 2002 ("FFRT").[1]  (Case No. 08–1362.)  Also before the Court is All-Tex's appeal of the bankruptcy court's January 18, 2008 order granting summary judgment in favor of appellee Branford Partners, LLC ("Debtor").  (Case No. 08–1364.)  Because the bankruptcy court's orders granting summary judgment in favor of both the Fornaciaris and Debtor addressed the same issues, and because All-Tex submits the same briefing in both appeals, the Court addresses both appeals in a single order.  Pursuant to Federal Rule of Civil Procedure 78, Local Rule 7-15, and Federal Rule of Bankruptcy Procedure 8012, the Court finds that this matter is appropriate for decision without oral argument.

## I.    FACTUAL & PROCEDURAL BACKGROUND

In December of 1999, Bert and Linda Fornaciari loaned $6,000,000 to Sunquest Development, LLC ("Sunquest") for Sunquest's purchase of a parcel of industrial land ("Parcel A") located at 12450 Branford Street, Los Angeles, California.  On December 17, 1999, Sunquest executed a promissory note ("Fornaciari Note") in favor of the Fornaciaris in the amount of $6,000,000.  The Fornaciari Note was secured by a first deed of trust ("Deed of Trust") on Parcel A.  Additionally, the Fornaciaris acquired a 20% interest in Sunquest, becoming equity 'members' of the company.

All-Tex alleges that it contracted with Sunquest on October 26, 2000 to purchase land on which Sunquest would construct a facility.  All-Tex asserts that Sunquest's successors breached this contract before filing for bankruptcy.  However, the Fornaciaris contend that there has never been a finding that such a contract existed or that Sunquest breached it.

---

[1]    In 2002, Bert and Linda Fornaciari formed the Fornaciari Family Revocable Trust ("FFRT"), and transferred all assets at issue here to the FFRT.  Collectively, Bert and Linda Fornaciari, and in some cases the FFRT, are referred to as "Fornaciaris."

On December 16, 2002, Sunquest and Plutus Alternative Strategies ("PAS"), one of Sunquest's equity members, entered into an agreement ("Operating Agreement") to form a new entity called Sunquest Development II ("Sunquest II"), which later changed its name to Branford Partners, LLC (the Debtor that filed the underlying bankruptcy case).  In March of 2003, PAS owned 99% of Sunquest II, and Sunquest owned 1%.  As 20% owners of Sunquest, the Fornaciaris owned 20% of the 1% of Sunquest II.  Sunquest II acquired two parcels ("Parcels B & C") adjacent to Parcel A.

On December 29, 2003, Sunquest II executed an "Amended and Restated Promissory Note Secured by Deed of Trust" in favor of the Fornaciaris.  The same day, Sunquest, Sunquest II, and the Fornaciaris executed a "Loan Assumption Agreement and Modification of Deed of Trust" ("Loan Assumption Agreement"), pursuant to which the Fornaciari Note was restructured and assumed by Sunquest II, and the Fornaciaris acquired an interest in Parcels B and C.

Also on December 29, 2003, PAS, the Fornaciaris, and another equity member of Sunquest II called Pinnacle West, LLC ("PW"), executed a "Second Amendment to Operating Agreement of Sunquest Development II, LLC" ("Second Amendment") which extinguished the Fornaciaris' original equity ownership in Sunquest, but made the FFRT an equity member of Sunquest II on certain terms and conditions.  It also transferred Sunquest's equity membership interest in Sunquest II to PW.

Later, Sunquest II changed its name to Bradford Partners, LLC and eventually filed for bankruptcy.  Parcels A, B, & C were sold, and the Fornaciaris and All-Tex filed claims to the proceeds.  All-Tex then filed an adversary proceeding against both the Fornaciaris and Debtor asserting that its claim has priority over the Fornaciaris' claim because the Second Amendment had the effect of subordinating the Fornaciari Note to claims of unsecured third-party creditors such as All-Tex.  The Fornaciaris and Debtor each moved for summary judgment on substantially the same grounds.  The bankruptcy court granted both motions for summary judgment, and issued virtually identical orders in each.  All-Tex then filed these appeals on the issue of whether the bankruptcy court erred as a matter of law in its

interpretation of the distribution provisions in the Operating Agreement and the Second Amendment.

## II.   STANDARD OF REVIEW

The bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of law are reviewed <u>de novo</u>.  <u>Sousa v. Miguel (In re U.S. Trustee)</u>, 32 F.3d 1370, 1372 (9th Cir. 1994); <u>Christensen v. Tucson Estates, Inc. (In re Tucson Estates, Inc.)</u>, 912 F.2d 1162, 1166 (9th Cir. 1990).  The Court's review here is <u>de novo</u> because only the bankruptcy court's conclusions of law regarding the interpretation of the Operating Agreement and Second Amendment are at issue.

## III.   ANALYSIS

All-Tex argues that, prior to the Second Amendment, the Operating Agreement provided for how Sunquest II would distribute money, including funds received upon the sale of the Debtor's assets.  Specifically, All-Tex points to the definition of "Operating Cash Flow" in the Operating Agreement:

> Operating Cash Flow means for any Fiscal Year (or portion of the Fiscal Year), the gross cash receipts of every kind of the [Sunquest II] Company for such period from operations, including any amounts drawn from the Working Capital and the proceeds of any sale, transfer, disposition or refinancing of Company assets for such period (other than Capital Contributions and any casualty insurance proceeds that will be used to repair or replace the Company's Property), less cash expenses, debt service on all Loans and additions to the Working Capital of the Company.

(Appendix Exhibit ("AE") 33.)  All-Tex asserts that the money from the sale of the Parcels in bankruptcy is considered Operating Cash Flow.  It also argues that the Fornaciaris' secured claim was originally excluded from the definition of Operating Cash Flow because it falls within a particular category of excluded "Loans" called "SD Obligations[.]"[2] (AE

---

[2]     "SD Obligations" refers to Sunquest Development LLC's ("Sunquest") obligations. (AE 34–35.)

34–35.)  However, the Second Amendment, to which the FFRT was a party, explicitly

deleted reference to "SD Obligations."  (AE 20.)  Rather, under paragraph 3(b), it provided

that:

> Notwithstanding any other provisions of the Operating
> Agreement, Operating Cash Flow shall be distributed to the
> Members in the following priority:
>
> > (I) First to PAS until PAS has received distributions in an
> > amount equal to the PAS Principal, together with any
> > PAS Preferred Return accrued thereon;
> >
> > (ii) Second, to FFRT until FFRT has received
> > distributions in an amount equal to the FFRT Senior
> > Preferred Return; and
> >
> > (iii) Thereafter, in accordance with the priorities
> > otherwise set forth in the Operating Agreement.

(AE 20.)  Under paragraph 3(a)(v):

> "FFRT Senior Preferred Return" shall mean (A) an amount
> sufficient to yield a twenty percent (20%) internal rate of return
> compounded annually on an investment of $6,480,000 made on
> December 21, 1999 (together with a full repayment of such
> investment), less (B) any payments made to FFRT under the
> FFRT Note, and less (C) the amount, if any, of the FFRT
> Pinnacle Return.

(AE 20.)  All-Tex argues that in paragraph 3, the Fornaciaris agreed that their secured claim

would no longer be paid separate and apart from other member interests (i.e., it was no

longer excluded from the definition of Operating Cash Flow), but rather that it would be

paid through member distributions of Operating Cash Flow.  All-Tex further asserts that,

because member distributions of Operating Cash Flow are subordinated to paying-off third-

party debt, the Second Amendment acted to subordinate the Fornaciaris' secured claim to

the claims of other creditors such as All-Tex.

      All-Tex's argument fails for a number of reasons.  First, the definition of "Operating

Cash Flow" does not include the proceeds from the sale of assets in bankruptcy.  Rather, it

refers to the proceeds earned by Sunquest II during its operation. Indeed, the definition of "Operating Cash Flow" appears in the <u>Operating</u> Agreement, and is defined as "the gross cash receipts . . . <u>from operations</u>, including . . . the proceeds from any sale[.]" (AE 33 (emphasis added).) This Court has previously held that Operating Cash Flow in the Operating Agreement does not include the sale of assets in bankruptcy. In <u>In re Branford Partners, LLC</u>, Case No. 07–6992 ("Evans Appeal"), another unsecured creditor, Robb Evans, appealed the bankruptcy court's order holding that the Fornaciaris' claim to the sale proceeds has priority over Evans' claim. On appeal, Evans asserted that the Operating Agreement and Second Amendment subordinated the Fornaciaris' claim to his own. The Court rejected this argument, holding that:

> The plain meaning of "operating cash flow" is the cash a company acquires from the revenue generated through its operations. The definition provided in the Sunquest II Operating Agreement comports to the term's plain meaning. . . . In other words, "Operating Agreement" simply does not include proceeds derived by a company from the sale of assets in winding down.

(Evans Appeal 6.) The Court finds that the analysis in the Evans Appeal is sound, and All-Tex has provided no reason to depart from it.

Second, neither the Operating Agreement nor the Second Amendment can reasonably be interpreted to apply to the Fornaciari Note and Deed of Trust. Rather, the Operating Agreement addresses issues related to operation of Sunquest II. As the bankruptcy court noted: "Operating Agreements typically address the internal workings of a company, not lender relationships. [Sunquest II]'s Operating Agreement fits this model, addressing formation, capitalization, distributions, management, books and records, dissolution and the like." (AE 105; AE 115.) The Court agrees.

The Second Amendment amended the Operating Agreement. Because the Operating Agreement had nothing to do with the priority of the Fornaciari Note and Deed of Trust, the Second Amendment had no affect on the Note, except as expressly provided:

> Concurrent herewith: . . . (ii) [Sunquest II] is assuming the indebtedness secured by such FFRT deed of trust; and (iii) the Company and FFRT are modifying such indebtedness to provide for, among other things, an extension of the maturity date thereof and a waiver of certain late charges accrued thereunder.  In consideration of the foregoing (including the fact that affiliates of FFRT hold equity in [Sunquest] and [Sunquest] is conveying its real property assets to [Sunquest II] and its membership interest in [Sunquest II] to PW), FFRT is being admitted to [Sunquest II] as a Member on the terms and considerations set forth herein.  The purpose of this Amendment is to provide for such admission and the admission of PW as a Member, to modify the provisions of the Operating Agreement with respect to cash distributions and profit allocations, and to modify various other terms and conditions of the Operating Agreement, as set forth herein.

(AE 19.)  Thus, by its plain terms, the Second Amendment was intended to provide for FFRT's admission as an equity member of Sunquest II, which was provided as consideration for FFRT's agreement to modify the terms of repayment of the Fornaciari Note, and to have the obligation assumed by Sunquest II.  The modification of the terms of repayment of the Fornaciari Note, however, was provided in the completely separate Loan Assumption Agreement, which was executed on the same day as the Second Amendment.  While the Loan Assumption Agreement modified certain repayment terms — for example, it extended the maturity date and waived certain late charges — it did not change the Debtor's obligation to repay the Note, and it did not subordinate the Fornaciari Note to other debts:

> This Agreement and the execution of other documents contemplated hereby do not constitute the creation of a new debt or the extinguishment of the debt evidenced by [the Fornaciari's] Loan Documents (except to the extent expressly provide [sic] in the Restated Note[3]/), nor will they in any way affect or impair the liens and security interests created by the Loan Documents, which New Borrower [Sunquest II] acknowledges to be valid

---

[3]/    The "Amended and Restated Promissory Note Secured by Deed of Trust" also did not change the priority of the Fornaciari Note.  (See AE 194–99.)  Rather, it provided for Sunquest II's assumption of the debt, and provided that Sunquest II "promises to pay to the order of [the Fornaciaris] the principal sum of Six Million Dollars ($6,000,000) together with interest on the unpaid balance of the Note[.]"  (AE 194.)

-7-

> and existing liens on and security interests in the Property.  New
> Borrower agrees that the lien and security interests created by
> the Deed of Trust continue to be in full force and effect,
> unaffected and unimpaired by this Agreement or by the transfer
> of the Property or any collateral described in financing
> statements filed in connection with the Loan Documents and that
> said liens and security interests shall so continue in their
> perfection <u>and priority</u> until the debt secured by the Loan
> Documents is fully discharged.

(AE 207–08 (emphasis added).)  All-Tex's argument that the Second Amendment, in apparent conflict with the Loan Assumption Agreement, subordinated the Fornaciari Note to unsecured or later-in-time creditors is implausible.  Indeed, if the Fornaciaris had intended to subordinate their claim, they knew how to do so.  In 2001, the Fornaciaris executed a subordination agreement in favor of Genesis L.A. Real Property Estate Fund, LLC ("Genesis").[4/]  (AR 115.)  No such subordination agreement exists in favor of All-Tex.

The fact that the Second Amendment deleted the "SD Obligations" component of the Operating Agreement is of no import.  The Fornaciari Note was paid through "SD Obligations" under the Operating Agreement because the Fornaciari Note was Sunquest's debt.  In other words, Sunquest II's payment of the Fornaciari Note under the Operating Agreement occurred through Sunquest because it was Sunquest's (not Sunquest II's) obligation.  In the Second Amendment, Sunquest conveyed its membership equity interest in Sunquest II to PW, and assigned its obligation under the Fornaciari Note to Sunquest II.  Thus, the deletion of the "SD Obligations" definition represents only that the Fornaciari Note was no longer an "SD Obligation[,]" but rather became Sunquest II's obligation.

The bankruptcy court concluded that the Second Amendment's paragraph 3(b) "addresses the equity rights of PAS, PW, and FFRT as members in [Sunquest II] and does not alter FFRT's right to be paid on its debt as a loan, duly perfected in the real property records of the county."  (AE 105.)  It also concluded that the Second Amendment does not

---

[4/]      Thereafter, PAS acquired Genesis.  As part of the December 2003 transaction, PAS and FFRT executed a formal agreement terminating the Genesis subordination agreement. (AE 207.)

provide All-Tex with priority over the Fornaciaris' claim.  (AE 116.)  The Court agrees.
Accordingly, the bankruptcy court's orders granting summary judgment in favor of the
Fornaciaris and Debtor are affirmed.

### CONCLUSION

For all the foregoing reasons, the bankruptcy court's January 18, 2008 Order granting
summary judgment in favor of the Fornaciaris, and January 18, 2008 Order granting
summary judgment in favor of Debtor, are both affirmed.

DATED:  September 6, 2010

_____

Percy Anderson
UNITED STATES DISTRICT JUDGE